BURLEIGH *v.* MILLER, ADMINISTRATRIX

[No. 84, October Term, 1955.]

58

*Decided February 13, 1956.*

60

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*H. Clay Espey*, with whom were *Henry A. Babcock* and *Green, Babcock & Bell* on the brief, for the appellant.

*W. Carroll Beatty*, with whom were *J. Bowie Lillard*, *David A. McNamee* and *John F. Lillard, Sr.*, on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a judgment for costs rendered in favor of Cathryn Miller, Administratrix of the Estate of Frederick K. Miller, Deceased, appellee, and against Edith Burleigh, appellant, by the trial judge sitting without a jury.

On July 18, 1952, Edith Burleigh sued Cathryn Miller, Administratrix of Frederick K. Miller, deceased, in the Circuit Court for Prince George's County. In the declaration she alleged that she had loaned the sum of $10,987.75 to Frederick K. Miller; that no part of that sum had been repaid to her, although Frederick K. Miller had promised to pay the same; that a claim for the aforesaid amount was properly filed in the estate of Frederick K. Miller and that his administratrix had failed and refused to recognize said claim as a valid obligation. She claimed said sum of $10,987.75. From the refusal of the trial judge to allow said claim, and entering a judgment for costs in favor of the appellee, the appellant appeals.

The testimony is essentially as follows. Mrs. Edith Burleigh, widow, plaintiff below and appellant here, was formerly a resident of Philadelphia. Her husband died in 1929. After her husband's death, in addition to keeping roomers, she conducted certain religious, philosophical and metaphysical classes in Philadelphia, where she met Frederick K. Miller, a married man, about 1932 or 1933. Although at first the relationship between Mr. Miller and Mrs. Burleigh had been casual, in later years it became intimate. For several years prior to his death, although married to another woman, Mr. Miller lived with Mrs. Burleigh holding her out to the public as his wife, Edith Miller. Appellant knew that Mr. Miller's wife, Cathryn Miller, was living and not divorced from her husband. He tried unsuccessfully on at least one occasion in Florida to obtain a divorce from his wife. At that time Mr. Miller agreed to pay, and for a number of years until his death did pay to his wife, the sum of $200.00 monthly for her support. Mrs. Miller knew that her husband was living with Mrs. Burleigh. The appellant and the decedent lived in the District of Columbia and in an apartment in Prince George's County, Maryland, for a number of months prior to his death on April 1, 1952.

Mrs. Burleigh operated a guest home in Miami, Florida, for two or three years until the sale of that property on December 1, 1950. At that time she received a check in the amount of $10,987.75 covering the net proceeds of the sale, which is the amount she seeks to recover in the instant case. While Mrs. Burleigh lived in Florida, Mr. Miller spent much of his time with her at her home there. Mr. Miller paid certain bills for utilities and taxes on Mrs. Burleigh's Miami property. He paid the rent while they stayed together in the District of Columbia. He generally paid their living expenses as was customary for a husband to do. On the other hand, the appellant devoted her entire time to Mr. Miller's personal well being and performed the services, among others, usually required of a cook and housekeeper. Mr. Miller, for a

number of years prior to his death, had been a lumber broker. His business consisted of buying lumber from various saw mills and selling it at a profit to dealers in various parts of the country. This business required considerable capital. Cathryn Miller, as the wife of the deceased, was appointed administratrix of his estate. Her first administration account showed assets in the amount of $15,273.51. The liabilities, exclusive of the cost of administration and including plaintiff's claim here of $10,987.75, amounted to $21,740.20.

Mrs. Edith Burleigh testified in open court before the trial judge as to the facts above recited and that she sold her house in Miami, Florida, on December 1, 1950, for $10,987.75. A check to her order on the First National Bank of Miami, Florida, dated December 1, 1950, from the L. Earl Curry Trust Account for $10,987.75 was offered in evidence. On the back of that check were the following endorsements: "Edith Burleigh, Frederick K. Miller, F. K. Miller Lbr. Co., for deposit only." This check was deposited in the Frederick K. Miller Lumber Company account in the Berks County Trust Company in Reading, Pennsylvania, and was paid on December 11, 1950, by the First National Bank of Miami. Mrs. Burleigh stated that at the time she received this check Mr. Miller's "cash position" was precarious. He did not have an office, bought lumber in different parts of the country in carload lots, and shipped it to dealers and furniture manufacturers.

Mrs. Nellie M. Fowler testified in a deposition as follows. She resided on Bladensburg Road in Washington, D. C., and kept a tourist home. She knew Mr. Miller ten years before his death. She also knew Mrs. Burleigh very well. She had been introduced to her as Mrs. Edith Miller when Mr. Miller brought her to her home seven or eight years before his death. She further testified that she heard a conversation about the sale of the Miami house. She said she advised Mrs. Burleigh not to sell it but Mrs. Burleigh said she was going to sell it because Mr. Miller's business was in "bad shape" and

she wanted to sell the house and lend him the money so he could build up his business. Mrs. Fowler identified the check in the amount of $10,987.75 and said that Mrs. Burleigh and Mr. Miller endorsed it in her presence on her dining room table. She said that the check was in payment for the Miami house and Mrs. Burleigh said: "I am going to turn it over to Fred." She further testified that she was with Mr. Miller and Mrs. Burleigh in the automobile the day they drove to the bank "to turn this check in." She did not get out of the automobile. She testified that when Mrs. Burleigh handed the check to Mr. Miller he told Mrs. Burleigh that he was only borrowing the money to build up his business and that he would pay it back. Mrs. Burleigh always said she wanted to get the money from the sale of the house so she could lend it to Mr. Miller. Mrs. Fowler further said that they talked about this loan several times in her presence. After they left her home and moved to Kent Village in Prince George's County she heard Mr. Miller discuss this $10,987.75 loan many times. She said: "He would sit and talk about how he was building up his business thanks to the loan from Edith, but felt sorry things were going slowly, and he still hadn't been able to repay her. * * * Well, his cry always was he felt bad that Edith had loaned him all her money, but he was always hoping he would soon be able to repay her." She also said that Mrs. Burleigh said: "* * * she was happy she loaned it to him, and it would not be long until they would have a permanent place to live, and then he could take care of his business." She never heard any conversation that Mr. Miller had repaid the loan to Mrs. Burleigh. He always said he owed Mrs. Burleigh $11,-000.00. On cross-examination she said she did not know until Mr. Miller's death that Mrs. Burleigh was not his wife. She was "not sure" that she knew Mr. Miller and Mrs. Burleigh had a joint account in the bank at Bladensburg. She did not know whether Mr. Miller paid Mrs. Burleigh interest on the loan. In answer to a question on cross-examination she stated that this loan was never re-

paid. She said that when Mrs. Burleigh endorsed the check and turned it over to Mr. Miller, she said: "I loan this to you willingly." He would always say: "Honey, it won't be long before you get your home back. I'll repay your $11,000.00. My business is picking up, and when it gets back in shape, you can buy a place in Florida." When asked whether Mrs. Burleigh meant to make a gift of this money to Mr. Miller, she replied: "Never! He wouldn't have it that way. He would not have accepted it. I have heard him say that."

Mrs. Anna Higgins testified in a deposition as follows. She resided in Philadelphia and had known Mrs. Burleigh approximately twenty-five years and Mr. Miller about twenty years. Mrs. Burleigh told her on the telephone that she was selling her home in Miami with the understanding that Mr. Miller was going to get the money. She knew their handwriting and identified their endorsements on the $10,987.75 check. She testified that it was the check Mrs. Burleigh received in settlement for the sale of her place in Florida. In her presence at her home in Philadelphia Mr. Miller had asked Mrs. Burleigh to lend him that money for his business. She said: "Mrs. Burleigh stated that she was turning the money over to Mr. Miller for his business, and I objected because she had no protection. She wouldn't even take a promissory note from him, and I objected in view of the circumstances, trying to impress upon her that she had no protection if anything happened, but she said she was perfectly willing to let him have it and she didn't need any protection from him, and he said it was a loan and he would definitely pay it back as soon as he could from his business." When asked whether she ever heard them discuss this matter at a later time, she replied: "Oh, many times. Everytime I saw Edith, I asked her if she had gotten any money back, whether Mr. Miller had made a will protecting her loan or given her a promissory note. She always told me not to worry about it. * * * Well, my husband and I were the ones that would bring it up. Edith was very, very dear to me

and I wanted to make sure that she had some protection, and in each instance Mr. Miller assured us that he would repay it as soon as he possibly could. We were interested in getting her protected by a note or some paper, but she would never hear of it." She said Mr. Miller and Mrs. Burleigh spent Christmas with her and her husband in Philadelphia in 1951. "As we were unwrapping our Christmas presents, Mr. Miller brought it up. He said, 'Edith, among all the other things I owe you, I haven't forgotten the monetary obligation in the amount of—' I think he called it $11,000. He said his prospects were good; in fact, he thought they were going to be exceptionally good, and he would repay her as quickly as possible." On cross-examination she testified that she knew Mr. Miller and Mrs. Burleigh were not married. She knew the loan was never repaid.

Appellee offered in evidence, over the objection of the appellant, a financial statement signed by Frederick K. Miller, Prop., and F. K. Miller Lbr. Company and given to the Berks County Trust Company of Reading, Pennsylvania, which showed liabilities of $900.00 but did not list the alleged loan from Edith Burleigh as a liability. The decedent at the time of his death on April 1, 1952, left an insurance policy with Colonial Life Insurance Company, wherein the beneficiary was originally Cathryn L. Miller, appellee, but later, by endorsement, the beneficiary was changed to provide that if the policy matured by death, the proceeds would be "Payable forthwith to Edith Burleigh, business partner of the insured, if living, otherwise to Anna Higgins, business partner of the insured, if living, otherwise to the executors or administrators of the insured." Litigation ensued as a result of said endorsement in another jurisdiction, and the proceeds of the policy were divided between appellant and Cathryn Miller, the wife, under a compromise agreement. At the time of Mr. Miller's death he had on deposit in the Citizens Bank of Riverdale $1,042.20 in the joint names of himself and Mrs. Burleigh, which amount was withdrawn by her on April 2, 1952.

Frequent objections to the admissibility of evidence were made by the appellee during the taking of the depositions of Mrs. Fowler and Mrs. Higgins. The appellee's attorney, in his argument in this Court, called our attention to the fact that the trial judge had never passed upon these objections. However, from the opinion of the trial judge it is evident that he considered the testimony of these two witnesses in their depositions admissible. Neither in the argument in this Court nor in the brief did the appellee contend that any part of the testimony in the depositions was not admissible. Therefore, these evidence questions are not before us on appeal. *Elko v. Elko,* 187 Md. 161, 165, 49 A. 2d 441, 168 A. L. R. 256; *Buttion v. Buttion,* 189 Md. 305, 311, 55 A. 2d 839.

The appellant contends that the financial statement given by Mr. Miller to the Berks County Trust Company was not admissible in evidence to show that the estate did not owe this debt. In *Heil v. Zahn,* 187 Md. 603, 608, 51 A. 2d 174, a claim was filed against the Zahn estate. We there held that a statement in writing made by the deceased before his death that he did not owe certain bills was hearsay in favor of the estate and therefore not admissible in evidence. The same ruling should apply here. The appellant also contends that a letter written on April 1, 1952, signed "Edith and Fred" on F. K. Miller Lumber Company's letterhead to an attorney, in which it was stated that they wished to make an appointment with the attorney in order that Mr. Miller could make a will protecting Mrs. Burleigh if anything happened to Mr. Miller, should have been admitted in evidence. We are of opinion that the rejection of this letter, if erroneous, is not harmful to the appellant in view of our finding in this case. As it was signed "Edith", certainly it was a self-serving declaration as to her.

The trial judge saw and heard only one witness in this case, the appellant, Edith Burleigh. Of course, under the provisions of Code, 1951, Article 35, Section 3, she

was not permitted to testify as to the transaction whereby she claims that she endorsed the $10,987.75 check to Mr. Miller as a loan. The trial judge was satisfied that this check represented the sale price of the Miami house and was Mrs. Burleigh's money and did not come from contributions made by Mr. Miller, as contended below by the defendant, appellee. The appellee neither in her brief or argument in this Court contended that this finding by the trial judge was erroneous, or that Mr. Miller had repaid Mrs. Burleigh. The trial judge found, however, that this check endorsed by Mrs. Burleigh to Mr. Miller represented a gift by her to him and, therefore, entered judgment for the defendant, appellee. The trial judge was of the opinion that Mrs. Fowler was either mistaken about the money being a loan, or deliberately mis-stated the facts. He based this on her testimony that she was a close friend of the appellant; that she knew Mr. Miller and Mrs. Burleigh had a joint bank account in the Bladensburg branch of the Citizens Bank of Riverdale; and that she said she was with them when they drove to the bank at Bladensburg to deposit the check but did not get out of the car. He thought this was contrary to the fact that the check was actually deposited in the Berks County Trust Company in Reading, Pennsylvania. However, we must note that Mrs. Fowler stated that she did not go in the bank. Of course, she did not know whether the check was deposited there or not. She did not say that they deposited the check in the Citizens Bank at Bladensburg but only that she went there with them when they intended to deposit it there. Mr. Miller may, for some reason, have decided from what he learned there, to send the check to the Reading bank for deposit.

The trial judge also concluded that Mrs. Higgins' testimony was not free from bias and based his disbelief of her testimony on the fact that she was named as a business partner of the deceased in the endorsement on his life insurance policy and therefore it was difficult to determine what relationship existed between the decedent and Mrs. Higgins and that Mrs. Higgins and Mrs.

Burleigh appeared to have been at various times business partners and "girl friends". There is nothing in the record to indicate that Mrs. Higgins was a "girl friend" of the decedent. She received no money from the insurance policy.

Of course, where the trial judge actually has the opportunity to see the witnesses and observe their manner of testifying, his finding of facts from their testimony is not set aside by this Court on appeal unless such finding was clearly erroneous. This rule does not apply where he does not see or hear the witnesses. *Schneider v. Menaquale,* 187 Md. 202, 204, 49 A. 2d 330; *Donigan v. Donigan,* 208 Md. 511, 119 A. 2d 430. Here, the trial judge had no greater opportunity to judge of their credibility than does this Court. They testified many times that this money was a loan. We see nothing in the case to discredit the depositions of Mrs. Fowler and Mrs. Higgins. Of course, the illicit relationship between Mr. Miller and Mrs. Burleigh should not be condoned. However, it is not sufficient to strike down a financial agreement between them. Compare *First National Bank v. Thomas,* 151 Md. 241, 245, 134 A. 210; *Maskell v. Hill,* 189 Md. 327, 333, 55 A. 2d 842.

Contracts of this character obviously can seldom be established by evidence of declarations of a deceased to mere strangers. *Hanson v. Urner,* 206 Md. 324, 333, 111 A. 2d 649. The only witnesses, who apparently knew anything about the transaction, testified distinctly and positively that this was a loan. *Loney v. Loney,* 86 Md. 652, 38 A. 1071. It is said in 32 C. J. S., page 1089, Section 1038: "Uncontroverted evidence should ordinarily be taken as true, and uncontradicted evidence which is not improbable or unreasonable cannot be disregarded, even if it comes from an interested witness, and, unless shown to be untrustworthy, is conclusive; but evidence not directly contradicted is not necessarily binding on the triers of fact, and may under proper circumstances be given no weight, as where it is inherently improbable or unreasonable, self-contradictory, or incon-

sistent with facts or circumstances in evidence." *Franklin v. State,* 208 Md. 628, 119 A. 2d 439. We see nothing in the evidence here to lead us to believe that the testimony of Mrs. Fowler and Mrs. Higgins is inherently improbable or unreasonable, self-contradictory or inconsistent with the facts and circumstances in evidence. It is not contended here that this was not Mrs. Burleigh's money or that Mr. Miller did not receive it or that he repaid it. Testimony of unimpeached witnesses should not be lightly waved aside as impossible or incredible. *York Motor Express Co. v. State,* 195 Md. 525, 535, 74 A. 2d 12, 16; *Campbell v. State,* 203 Md. 338, 345, 100 A. 2d 798; *George v. Capital Traction Co.,* 295 Fed. 965, 968; *Chesapeake & Ohio R. Co. v. Martin,* 283 U. S. 209, 216, 75 L. Ed. 983, 988.

The trial judge was further of the opinion that, as Mr. Miller and Mrs. Burleigh were illicitly living together as man and wife and as she had been held out and considered as his wife to all intents and purposes by the general public, the case of *Reed v. Reed,* 109 Md. 690, 692, 72 A. 414, was applicable. In that case during a lawful marriage a wife with her own money purchased real estate and caused it to be conveyed to herself and her husband as tenants by the entireties. Upon a subsequent divorce it was converted into a tenancy in common. The trial judge here relied on the following quotation from that case: "It has been repeatedly held by this Court that if a wife gives to her husband property belonging to her separate estate, or permits him to apply it to his own use, or he does so with her knowledge and consent, in the absence of proof that it was given to him to be held in trust for her use, or of a promise by the husband at the time to repay it, it will be presumed that it was intended as an absolute gift to him, and she had no claim therefor against him or his estate. *Edelen v. Edelen,* 11 Md. 415; *Kuhn v. Stanfield,* 28 Md. 210; *Farm. & Mer. Nat. Bank v. Jenkins,* 65 Md. 245; *Jenkins v. Middleton,* 68 Md. 540; *Taylor v. Brown,* 65 Md. 366." Here, it is not contended that Mrs. Burleigh was the

lawful wife of Mr. Miller. Therefore, that principle is not applicable here. We know of no case which applies this presumption to a transfer of property from a paramour to a married man.

The trial judge also relied upon the financial statement given by Mr. Miller to the Berks County Trust Company. As above stated this statement was not admissible. If admissible, its weight was doubtful considering the relationship of Mr. Miller and Mrs. Burleigh.

The trial judge also placed weight upon the fact that no note was ever given, no time was fixed for repayment, and no interest ever charged. Mrs. Higgins testified that Mrs. Burleigh did not desire a note as she had confidence the loan would be repaid. On account of the relationship between the parties Mrs. Burleigh probably did not desire interest. As to the fact that no time for payment was specified, it seems from the testimony that payment was contemplated when the financial condition of Mr. Miller became such that he did not need the money in his business. The authorities hold that in loans, similar to the one here, no specific agreement as to the time of repayment is required. *In re Heiler's Estate,* 288 Mich. 49, 284 N. W. 641; *Pinnacle Packing Co., Inc. v. Herbert,* 157 Ore. 96, 70 P. 2d 31; *Milana v. Credit Discount Co.,* 27 Cal. 2d 335, 163 P. 2d 869; *Lindsey v. Hamlet,* 235 Ala. 335, 179 So. 234. See also *In re Grand Union Co.,* 219 F. 353, 356, 135 C. C. A. 237; *O. A. Graybeal Co. v. Cook,* 111 Cal. App. 518, 295 P. 1088; *Yakek v. Delaware L. & W. R. Co.,* 28 N. Y. S. 2d 35, 176 Misc. 553.

There seems to be no question here that the amount claimed was the appellant's money and that she turned it over to the deceased. It was said by Judge Markell in *Beard v. Beard,* 185 Md. 178, 186, 44 A. 2d 469: "A clear and unmistakable intention on the part of the donor to make a gift of his property is an essential requisite of a gift. *Hutson v. Hutson,* 168 Md. 182, 189, 177 A. 177; *Thornton on Gifts and Advancements,* Sec. 70." In *Hutson v. Hutson, supra,* this Court quoted the following: "A clear and unmistakable intention on the

part of the donor to make a gift of his property is an essential requisite of a gift inter vivos. * * * In this respect there is no distinction between verbal gifts and those evidenced by writing or between gifts of personalty and of realty. * * * The intention of the grantor * * * should prevail unless in conflict with some settled rule of law." See also *Berman v. Leckner,* 193 Md. 177, 66 A. 2d 392.

There is no evidence here that the appellant intended the transfer of her money to the deceased to be a gift. We are of the opinion that the appellee has not proven that it was a gift. Judgment will therefore be rendered in favor of the appellant for the sum of $10,987.75, with interest from April 1, 1952, the date of Mr. Miller's death, with costs.

> *Judgment reversed, and judgment entered in favor of the appellant for $10,987.75, with interest from April 1, 1952, with costs.*